IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MIKO SQUIRE,

    *Plaintiff*,

    v.                        Civil Action No. ELH-17-3597

FEDEX FREIGHT, INC.,

    *Defendant*.

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Miko Squire has filed suit, as amended, against his former employer, defendant FedEx Freight, Inc. ("FedEx"), under the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code (2014 Repl. Vol.), § 20-601 *et seq*. of the State Government Article ("S.G."). ECF 20 (the "Amended Complaint").[1] Squire, who is transgender, worked as a truck driver for FedEx from January 2014 to March 2017. *Id.* ¶ 3. He contends that he was "discharged from employment based on his gender identity, gender, and/or sexual orientation." *Id.* ¶ 23.

FedEx has filed a post-discovery motion for summary judgment (ECF 57), supported by a memorandum of law (ECF 57-1) (collectively, the "Motion") and several exhibits. ECF 57-2 to ECF 57-12. FedEx contends that Squire was terminated because of "his refusal to accept an

---

[1] Suit was filed in the Circuit Court for Baltimore City against FedEx and Terrika Martin. ECF 2. Defendants removed the case to federal court on the basis of diversity jurisdiction, pursuant to 28 U.S.C. § 1332. ECF 1. The case was initially assigned to Judge Marvin Garbis, who granted Martin's motion to dismiss. *See* ECF 10; ECF 19. Martin was not named as a defendant in the Amended Complaint. ECF 20. Thereafter, Judge Garbis dismissed plaintiff's retaliation claim. *See* ECF 26.

The case was reassigned to me due to the retirement of Judge Garbis.

assignment that was part of his job duties." ECF 57-1 at 2. Squire opposes the Motion. ECF 60 (the "Opposition"). In his Opposition, Squire contends that he was subjected to discriminatory discipline. ECF 60 at 17. He has also submitted multiple exhibits. ECF 60-1 to ECF 60-16. Defendant has replied. ECF 63 (the "Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I.    Factual Background

### A.

Squire was born female but has "identified as a male and lived as a male [his] whole [adult] life." ECF 63-1 (Dep. of Squire) at 3-4. From January 2014 to March 2017, Squire was employed by FedEx as a delivery driver. ECF 57-2; ECF 57-12. He was assigned to the Annapolis Junction location. *See* ECF 60-8 (Dep. of John Keenan, FedEx employee) at 5, p. 10.[2]

On plaintiff's "Personal Data" form for FedEx, Squire identified his gender as "male." ECF 57-2 at 2. The Maryland driver's license he submitted with his employment application also identified his gender as male. *Id.* at 3. Squire, who has two children (ECF 57-3 at 6), identified his wife as his emergency contact. ECF 57-2 at 2.

Apparently, Squire's fellow drivers were not aware that he is transgender. *See* ECF 60-8 at 7, p. 18-19; ECF 57-4 (Dep. of Dominick June) at 8-9, pp. 41–42. Squire acknowledged at his deposition that no one at FedEx had ever used derogatory terms for transgender people in his

---

[2] FedEx asserts that Squire "worked as a City Driver at the Baltimore Service Center." ECF 57-1 at 3. For this proposition, FedEx cites to Squire's Amended Complaint (ECF 20). However, the Amended Complaint does not explicitly state that Squire worked at the Baltimore Service Center. The record reflects that Squire's position was that of "City Driver." *See, e.g.*, ECF 60-13 at 2. Squire's termination paperwork states: "Location: FXFWBA." ECF 60-12 at 2. And, Keenan testified that he worked with Squire at Annapolis Junction. ECF 60-8 at 5, p.10.

presence. ECF 57-3 (Squire Dep.) at 10. Nor had any one ever told Squire that they did not want to work with him because of his gender identity. *Id.*

In his suit, Squire alleged that he worked for over two years without complaints about his performance. ECF 20, ¶ 6. But, Squire had actually received "written warnings eight times before February 2016" for "untimely lunch breaks." ECF 57-3 at 10, 15–16. He does not contest the validity of those warnings. *Id.* at 16.

In August 2016, Squire underwent a hysterectomy, the final stage of his gender reassignment surgery. Prior to the surgery, he submitted a leave request to FedEx's Human Resources representative, Terrika Martin, for time off from work. ECF 20, ¶ 7. The record does not reflect any specific information about the actual leave request, nor does it reflect that Squire disclosed the reason for the leave request. Plaintiff also appears to have applied for Short Term Disability. *See* ECF 57-7 (Janice Munzner Dep.) at 3.

Squire's medical leave began on August 15, 2016. ECF 57-8 at 2. In a letter dated October 10, 2016, addressed "To Whom It May Concern," Squire's gynecologist, Fouad Abbas, M.D., advised that Squire would be released to return to work on October 17, 2016. *Id.* at 3. The correspondence is on the letterhead of "Sinai Hospital" and "Department of Obstetrics and Gynecology[,] Division of Gynecologic Oncology." *Id.* at 3. It also indicates, in small print: "Practice limited to: Gynecologic Oncology, Pelvic Reconstructive Gynecologic Surgery." *Id.* In the letter, Squire's doctor stated: "Mr. Squire has been under my care. . ." *Id.*

Squire returned to work on October 17, 2016. ECF 60-10 at 4.

According to Martin, for Squire to return to work, he had to undergo a "DOT physical."[3] ECF 60-2 at 8-9. Martin testified that the paperwork for the DOT physical was to be submitted to management and then forwarded to the safety team, which would clear Squire to return to his duties as a driver. *Id.* at 9-10.

In an undated series of email, chat, or text messages, Squire contacted Martin, asking about "bcbs," *i.e.*, BlueCross BlueShield, "to see what they cover or don't cover."[4] ECF 60-3 at 2. In another exchange, Squire asked Martin if he needed to get a DOT physical in order to return to work. *Id.* Martin responded, "You were out for your shoulder, correct?" Squire said, "no." Then, Martin asked: "What were [you] out for?" Squire answered: "i had surgery on my stomach." Martin said, "Oh ok." *Id.* And, she stated that she would look into it.

Thereafter, Martin advised Squire that he needed "a DOT physical along with a release," and that "[t]he surgery will have to be listed on the new physical." *Id.* Squire responded: "What do you mean 'surgery would have to be listed on physical'?" *Id.* Martin answered: "Not sure that's what was stated." *Id.* Squire then replied, *id.* at 3: "ok because if i have to give a copy to my supervisor. To me thats [sic] against my privacy. . . ." *Id.* at 3. Martin answered: "It goes into your medical file which is secured. If this is required per DOT regulations there should not be an issue. I would suggest asking those questions to the person conducting the physical." *Id.* Martin indicated she was not working at Squire's location that day. *Id.*

_____

[3] The terms "DOT physical" and "DOT recertification" are not defined in the record. Presumably, DOT is an abbreviation for the U.S. Department of Transportation.

[4] The exhibit appears to be a compilation of communications. Plaintiff spells Ms. Martin's first name as "Terrica." ECF 60-3 at 2. Although plaintiff did not submit copies of the original exchanges, FedEx does not dispute the accuracy of the content.

Later, Squire wrote: "Giving it to ur supervisor is breaking the Hippa Law, and confidential. Only because of the medical information that's on it." *Id.* Martin responded that Squire could fax the information to Debra Rhoades, a Leave of Absence Specialist for FedEx. ECF 60-3 at 3; ECF 60-10 at 2. But, she also said that Squire had "to provide the hard copies to [his] manager," because it "goes into your medical file." ECF 60-3 at 3.

Squire avers that FedEx "had [him] put the reason [he] was out on [his] DOT form" and that he listed "hysterectomy" on the paperwork. ECF 60-1 at 5. He testified that he gave a copy of the form stating he had had a hysterectomy "to HR and Kevin [Brown]," *id.*, who was Squire's manager. ECF 60 at 3.

Brown no longer works for FedEx, nor was he deposed. ECF 57-1 at 10. Plaintiff notes that his "counsel tried extensively to locate and serve Mr. Brown with a Notice of Deposition in this case." ECF 60 at 15 n.3. He add, *id.*: "Unfortunately, Kevin Brown is too common a name, and counsel's efforts were unsuccessful."

Andrew Bartnik, the Operations Manager and FedEx's Rule 30(b)(6) deponent (ECF 60-9 at 2), testified at his deposition that such paperwork was usually given to him or the center manager. ECF 60-5 at 10. It is stored in the employee's medical file, which is "[l]ocked in a cabinet in the center manager's office." *Id.*

On October 14, 2016, shortly before Squire's return from medical leave, there was a flurry of electronic activity concerning Squire. An email was sent at 12:37 p.m. from "noreply@fedex.com" to Rhoades. ECF 60-10 at 3. The subject line was "MIko [sic] Squire, 2644594-Release/Physical." *Id.* Another email was sent at 12:54 p.m. from Brown to Rhoades, Bartnik, and two other FedEx employees, Lee Bitler and Peter Filipowicz. *Id.* at 2. The subject line is "Miko Sqrire [sic], 2644594." *Id.* The record does not include the content of this email. At

1:27 p.m., Rhoades forwarded the email from Brown to Janice Munzer, Disability Benefits Specialist for FedEx. *Id.* at 2. At 2:30 p.m., Munzer forwarded the email to Rhoades and to Tammy Rogers, who worked in the Safety Department at FedEx. ECF 57-7 at 3, p. 12. The word "Hysterectomy" appears in the body of the email. ECF 60-10 at 2. The email indicates that it included as attachments the release/physical attachment from the initial email and a personnel change request form with Brown's signature, approving Squire's return to work. The document also contains a handwritten notation, as follows: "Drivers [sic] does not want others to know reason off wk." *Id.*

Munzer works in Harrison, Arkansas. ECF 57-7 at 7, p. 33. At her deposition, Munzer denied that she hand wrote the words that appear on the printout of the email. *Id.* at 5, p. 25.

At her deposition, Munzer acknowledged that she sent two emails, almost at the same time, one with the word "hysterectomy," and one with the word "surgery" in place of "hysterectomy." *Id.* at 5, p. 24; *id.* at 7, p. 30-31. Both were sent to Rhoades and Rogers. *Id.* at 5, p.24. The one with the word "surgery" is not part of the record. Notably, she indicated that the email with the word "hysterectomy" did not appear to have been "sent to anyone in the service center." *Id.* at 7, p.32. The locations of the other members of the email chain, aside from Brown, are not specified in the record.

The emails appear to have been produced from the inbox of Rogers. ECF 60-10 at 2-3. Rogers was responsible for determining whether a driver returning to work after a medical leave was in need of a physical and for reviewing the physical. ECF 57-7 at 3, p. 12.

**B.**

On March 8, 2017, Squire's shift began at 9:30 a.m. ECF 57-1 at 3; *see* ECF 57-3 at 3 (indicating that Squire routinely worked the "9:30 run"). Squire had finished his deliveries for the

day when, at 4:23 p.m. he received a text message from "Dispatch," via his supervisor, James Patterson. ECF 57-10 at 3; ECF 57-12 at 3; ECF 60 at 5. Patterson indicated that Squire should "come back for a delivery." ECF 57-10 at 3; ECF 60-1 at 10. The message also stated that Squire could "pick which one" of two delivery run options he wanted. ECF 57-10 at 3.

The options were "a coffing [sic] to a funeral home" or "a keferator to a res." *Id.* Squire responded "NIETHER" [sic], to which Dispatch responded, "it's a or b. . . ." *Id.* Squire replied: "I SAID NEITHER ITS TO [sic] LATE IN THE DAY." *Id.* at 2. Patterson answered: "ok . . need a statement from you as to why on your 7th hour on your book you are refusing an assignment . . . have it completed when you get back please." *Id.* Squire replied: "A [sic] ASSIGNMENT IS SOMETHING UR AWARE NOT SOMETHING THATS [sic] LAST MINUTE." *Id.* Patterson answered: "u are on ur 7th hour, and this business does not plan things arise miko. . . and u are a late guy. . I will find someone today. . . get me my statement so I can take it up the ladder please". *Id.*

Squire testified that he declined to take the extra delivery because "his hand was swollen." ECF 60-1 at 13. He explained that he did not include this reason in the text exchange because he was driving back to the service center, but he claimed he disclosed it when he returned to the office. *Id.* at 13–14. He did not perceive that he refused work; he assumed that Dispatch would "go up the seniority ladder" in order to find a driver to take the delivery run. *Id.* at 16. And, he claims that he was not offered a second chance to take a delivery run because "they already said they had it covered." *Id.* at 17.

Upon his return, Squire met with Brown and Patterson. *Id.* at 18. They told Squire that his refusal to work constituted insubordination. *Id.* Squire maintained that he did not believe that he had refused work, in light of the "seniority ladder." *Id.* He explained that there were "several

people" under him in seniority who he had seen leave to go home and that one of them could have taken the work. *Id.* at 19. As noted, Squire also claims that he disclosed that his hand was swollen. *Id.*

Squire acknowledged that people who started before him that day, *i.e.*, before 9:30 a.m., "would have either been done or . . . on overtime[.]" *Id.* at 20. But, he insisted that others on his shift, who were under him, could have been asked. *Id.* Additionally, Squire testified that the Conduct of Employees policy referenced at his deposition was different from what was shown to him at his meeting with Brown and Patterson. ECF 57-3 at 11. He testified that he was read "only one sentence and it didn't explain anything . . . ." *Id.* at 12.

Plaintiff produced a handwritten statement, dated March 8, 2017, approximately two and a half pages in length. ECF 63-1 at 12; 63-3 at 2-3. Notably, Squire's handwritten statement does not reference his swollen hand. ECF 63-3 at 2-3. In the statement, Squire said: "Every [sic] since I've been here people have been refusing work & they would ask the next person. . . ." *Id.* at 2. He also said that he had never been told that the 9:30 a.m. drivers took all the extra deliveries. *Id.*

In addition, Squire prepared a typewritten statement, also dated March 8, 2017. ECF 60-6. There, he stated, *inter alia*, that he told Patterson and Brown that he declined the extra work because he was not feeling well and his "hand was swollen." *Id.* at 3. Squire explained that he "was under the impression that extra jobs was seniority based." *Id.* at 2. He perceived the inquiry from Dispatch "as a general question," and not as a "demand or order." *Id.* Squire also stated that he believed Patterson and Brown were "either giving some people special privileges or harassing [him]." *Id.* at 4.

Further, plaintiff stated that "this was the first time" he had heard about a "rule" to the effect that the "9:30 crew is supposed to do all extra/leftover work and [they] cannot refuse." *Id.*

at 3. He claimed: "At FedEx we are told that everything is seniority based." *Id.* Squire recalled: "They tried to say I was insubordinate but no one never asked drivers under me." *Id.* Squire added: "The reason I said I don't want neither is because I was told that we go by seniority which means there is someone somewhere below me who they could have gave this run to. . . no one ever said we couldn't say no or refuse extra jobs." *Id.* He also noted that he had "seen people refuse to do a route and jobs all the time and they never sad [sic] they was being insubordinate or been suspended for it, I'm just confused as to why this is different." *Id.*

Squire testified that he prepared this typewritten statement at home because he "didn't really want to write that day" due to his swollen hand. ECF 63-1 at 14. It is unclear whether Squire prepared the typewritten statement on the day of the incident, however. Notably, the last page states: "Then Kevin told me not to come in on Thursday so I returned to work on Friday to find out [if] I have to talk to HR before returning." ECF 60-6 at 5. Friday would have been March 10, 2017.

Martin noted in an "Interview Recap" of March 8, 2017, that Squire texted her on March 8, 2017, at 4:37 p.m., stating that he "may be suspended." ECF 57-12 at 4. She responded that she would speak with him the following day, and Squire sent her follow up text messages as to his conversation with Brown. *Id.*

According to Martin, at some point on March 8, 2017, Brown telephoned her, "asking about the procedures when an employee refuses a work assignment." *Id.* She told Brown that "insubordination falls under Conduct of Employee policy and that if he has an employee who is being insubordinate, he is to explain that to the employee and tell them that by them refusing the directive, they will be relieved of duty and could be terminated." *Id.* She reiterated in a second

call with Brown that he needed to explain "insubordination and explain to Squire that he can lose his job." *Id.*

The following day, March 9, 2017, Martin again spoke with Brown. *Id.* He stated that he explained to Squire that he was being insubordinate and could lose his job. *Id.* He noted that "Squire barely wanted to talk with him about the refusal and brought up old issues that were closed such as holiday pay." *Id.*

Patterson emailed Martin at 2:35 p.m. on March 9, 2017. ECF 57-12 at 3. The email stated, *id.*:

> On 3/8/2017, about 6.5 hours into his shift, I assigned Miko a pick up. I sent him two options. He replied "neither." I then said neither was no [sic] an option it was A or B. He then replied "I said neither it is too late in the day". I then informed him that I needed him and that he is to be alert, rested and ready to work a maximum of 11 hours of his book time if needed and that things come up (see convo in email from handheld)… He then returned to the center and wrote up a statement after myself and Kevin Brown (SCM) went over Fed Ex policies with him.

Martin recounted that she spoke to Patterson, apparently on March 9, 2017. ECF 57-12 at 4. She recalled that Patterson related that he had asked Squire to make an additional delivery and provided him with options. ECF 57-12 at 4. When Squire refused, Patterson asked him to provide a statement. Patterson stated that when Squire came to the terminal, he asked to see the policy and Patterson read it to him. *Id.* In addition, Patterson "stated he provided Squire another chance to go out in which Squire started to state it was too late in the day and that he should not have to go out." *Id.* Squire "finally provided a written statement." *Id.*

Martin also related that on March 10, 2017, she spoke with Squire, who explained that he "showed up to work because he was told 'not to show up to work tomorrow,'" *i.e.*, March 9, 2017. *Id.* at 5. He maintained that he "did not see his actions as refusal of work and felt that Patterson should have explained to him that he did not have an option." *Id.* Squire stated that he "thought

in situations like this, he can refuse based on seniority and the person underneath him should have been the person to send back out." *Id.* Squire also said that "he only refused work because his hand was swollen." *Id.* Martin asked him if he had informed leadership of this, and Squire at first said no but then said yes. *Id.* He stated that he felt "communication in the center is poor and does not exist." *Id.*

Dominick June, another FedEx driver, testified at his deposition that Dispatch asked Squire to make the extra run when he got back to the terminal. ECF 57-4 at 5, p. 19. June claimed that the dispatcher asked Squire "three times," while the "terminal manager" twice asked Squire to take the extra run. *Id.*

June recalled that he was in the driver's lounge with Squire when Patterson, the supervisor, gave Squire the assignment, stating: "I need you to run this." *Id.* at 6, p. 22-24. Squire said, "no." *Id.*, p. 22. June recalled that "Jim got up out of his chair and said, 'No, I need you to run it.' And then they got kind of loud." *Id.* at 23. Although June was not "100 percent sure," he believed Squire was asked to make a delivery of school supplies in Bethesda, or for a PTA. *Id.* at 7, p. 28.

On March 15, 2017, Martin prepared a "Corrective Action Recap," again describing the incident. ECF 60-13. In part, she wrote that Patterson, Operations Supervisor, sent a message to Squire "to come back to the center for a delivery along with an option as to which delivery he would like to take." *Id.* at 2. Squire declined, and Patterson asked again. Squire again declined. *Id.* Patterson then asked for a statement from Squire as to the reason for the refusal. *Id.* When Squire returned to the Center, Patterson and Brown met with him and "reviewed the policies/procedures (Conduct of Employee and Driver Manual Lesson 15) with Squire." *Id.* Brown "explained insubordination and advised Squire he was being insubordinate and that he

could lose his job." *Id.* Patterson indicated that refusal to work "is considered a voluntary quit." *Id.*

According to the Corrective Action Recap, after Squire completed his statement, Brown told him that "he was suspended and not to show up for work the following day until notified." *Id.* at 2. Squire came to the Center on March 10, 2017, because he thought he was only suspended for one day. *Id.*

Martin concluded that "Squire violated the Driver Manual Lesson 15 [the "Driver Manual"] and the Conduct of Employees policy [the "Conduct Policy"]." *Id.* The Corrective Action Recap indicates that no prior corrective action had been taken. *Id.* at 4.

The Corrective Action Recap reflects the attachment of certain documentation. *Id.* at 4. Martin included the definition of "Insubordination," apparently from the Conduct Policy. *Id.* "Insubordination" includes "Improper refusal to perform assigned work." *Id.* The "Procedures" section notes: "Drivers refusing work offered to them will be considered a voluntary quit. . . ." *Id.*

## C.

At his deposition, Squire testified that after he returned to work following his surgery, he had to deal with "false writeups" that were "excessive." ECF 57-3 at 8. Squire also testified that "with extra work, you're supposed to go and follow the seniority rule." ECF 60-1 at 12. That meant, according to Squire, that if he did not want the work, Dispatch would "find someone under [him] to do it" and that there was "always someone under him." *Id.*

June testified that extra work was assigned primarily by shift time rather than seniority. ECF 57-4 at 3, p. 10–18. According to June, the person who started working later, and thus had more hours on his shift, would typically take the extra run. *Id.* at 11. According to June, seniority

only came into play if there were more than one person who started at the same time. *Id.* at 12. The least senior person would not have a choice as to taking the extra work. *Id.*

At his deposition, Bartnick testified that going in order of seniority was "common courtesy." ECF 60-5 at 15. But, it was not a requirement. *Id.*

John Keenan, another driver, testified at his deposition that when there was extra work, sometimes the supervisor first asked for volunteers. ECF 60-8 at 5, p. 12. If there were no volunteers, the supervisor would "make someone from the bottom," i.e., the least senior person, take the work. *Id.* p. 13. Keenan was not aware of a policy by which drivers could be terminated for refusing to take an overtime extra assignment. *Id.* at 6, p. 14. He also testified that he had previously refused assignments but he was never disciplined. *Id.* Moreover, he knew of other drivers who had also refused assignments, without discipline. *Id.*, p. 15.

As noted, following Squire's refusal to make the extra delivery, Squire was suspended and then terminated, effective March 17, 2017. ECF 57-12 at 2. His personnel record reflects that the departure was "Involuntary," and that it was due to "Insubordination." *Id.* It was approved by Kevin Brown and Bryan Jenkins, another FedEx manager. *Id.*; *see* ECF 60-2 at 13.

Martin testified that she was unaware of other City drivers who had been involuntarily separated for insubordination. ECF 60-2 at 14. She was also unaware of any corrective action with regard to Squire's insubordination. *Id.* at 15. Martin noted that she did not consider Squire to be "an employee that would come up as somebody that they would have an issue with." *Id.* at 16. When she spoke to Brown, she asked if Brown had given Squire another chance to go out on the run. *Id.* at 17–18. She did not testify as to Brown's response. *Id.* But, it was "important to [Martin] as to whether or not Mr. Squire had been given a second opportunity to perform [the] work assignment[.]." *Id.* at 29. And, Martin indicated that it "was [her] understanding that Mr.

Squire had been given a second opportunity to perform that work assignment, but still refused it[.]"
*Id.*

At his deposition, Bartnik testified that the disciplinary progression for hourly employees typically starts with "coaching," which is verbal. ECF 60-5 at 6. The verbal coaching is followed by written corrective action. *Id.* Then, there is a "critical written," which requires HR's approval, and can range from a short-term suspension to a long-term probation. *Id.* Typically, this progression is the same for performance issues and misconduct. *Id.* at 7. Bartnik could not recall "ever being involved in a disciplinary action of critical or higher for insubordination." *Id.* at 8.

Bartnik indicated that refusal to work "could be . . . insubordination." *Id.* at 9. But, he acknowledged that there might be exceptions to a refusal if the employee gave a reason for declining to take the extra work. *Id.* at 14.

In a section titled "Insubordination," the FedEx Conduct Policy states, ECF 60-15 at 3:

> Employees must follow work instructions. Differing ideas or suggestions are welcome, but should be discussed in an appropriate manner. Examples of insubordination include:
>
> - Improper refusal to perform assigned work.
> - Failure to follow work instructions or meet employee job expectations.

The Driver Manual (ECF 60-14) contains a section titled "Lesson 15-Dispatch Procedures." *Id.* at 2.[5] It defines "Showtime" as "the time at which a driver must report to Dispatch. The local Dispatcher will provide each driver with a work assignment. . . ." *Id.* at 3. In "Procedures," it states, in part, *id.*: "Drivers refusing work offered them will be considered a voluntary quit and their name will be removed from the seniority list. . . ." *Id.* The Driver Manual

---

[5] This Section was revised on March 27, 2018. ECF 60-14 at 2.

also notes that "Overflow Freight" is defined as follows, *id.* at 6: "Schedule(s) above normal freight levels and/or driver resources." Overflow runs are assigned to the "extra board" drivers "by center job class seniority on a daily basis for the duration of the vacancy." *Id.*[6] The Driver Manual further states: "Any overflow run(s) remaining *after* the extra board driver(s) have been exhausted will be covered by canceling the *most appropriate bid run(s)*, therefore making a driver(s) available to cover the remaining overflow runs." *Id.* (emphasis in original).

FedEx also maintains an "Equal Employment Opportunity/Non-Discrimination Policy." It states, in relevant part, ECF 60-11 at 2:

> This policy applies to all employees and prohibits any kind of unlawful discrimination or harassment on the basis of race, color, ethnicity, gender, pregnancy (including childbirth or a related medical condition), religion, national origin, citizenship, age, sexual orientation, gender identity, gender expression, genetic information, disability, status as a disabled veteran or other covered veteran, military leave or service, marital status, or any other basis protected by applicable provincial, federal, state, or local law.

The policy defines "unlawful discrimination as follows, *id.* at 3:

> "[T]reating similarly-situated persons differently in recruitment, selection, placement, promotion, job assignments, education, disciplinary action and/or other terms or conditions of employment based solely on race, color, ethnicity, gender, pregnancy, religion, national origin, citizenship, age, sexual orientation, gender identity, gender expression, genetic information, disability, status as a disabled veteran or other covered veteran, military leave or service, marital status or other protected category, where such status or category is not a bona fide occupational qualification.

Additional facts are included, *infra*.

## II.    Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

---

[6] "Extra board" is not defined in the excerpt of the Driver Manual submitted to the Court.

the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (May 17, 2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

### III.     Discussion

### A.

The Maryland Fair Employment Practices Act is the State's analogue to the federal employment discrimination statutes. *See* S.G. §§ 20-601 to 20-610; *Alexander v. Marriott Int'l, Inc.*, No. RWT-09-2402, 2011 WL 1231029, at *6 (D. Md. March 29, 2011) (recognizing MFEPA as "the state law analogue of Title VII"); *see also Haas v. Lockheed Martin Corp.*, 396 Md. 469, 483 n.8, 914 A.2d 735, 743 n.8 (2007). Maryland courts 'traditionally seek guidance from federal cases in interpreting [it].'" *Eubanks v. Mercy Medical Center, Inc.*, WDQ-15-513, 2015 WL 9255326, at *7 (D. Md. Dec. 17, 2015) (quoting *Haas*, 396 Md. at 481, 914 A.2d at 742 (construing former Md. Code, Article 49B)). Indeed, Maryland courts interpreting MFEPA have often found federal cases arising under Title VII to be persuasive authority. *See, e.g.*, *Taylor v. Giant of Md., LLC*, 423 Md. 628, 652, 33 A.3d 445, 459 (2011); *Molesworth v. Brandon*, 341 Md. 621, 632–33, 672 A.2d 608, 614 (1996); *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494, 578 A.2d 766, 772 (1990); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 n.8, 66 A.3d 1152, 1166 n.8 (2013).

Accordingly, the Court will analyze the MFEPA claim by reference to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e) *et seq.* *See Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012).

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). *See, e.g., Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 212 (2015); *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207-08 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d

932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014). Title VII also states, in part: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m).

"Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Disparate treatment occurs when an employer has treated an employee "'less favorably than others because of' a protected trait." *Ricci*, 557 U.S. at 577 (citation omitted).

In general, *at trial* a plaintiff may establish a discrimination claim through "two avenues of proof." *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (Title VII); *see Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The second avenue involves a burden shifting approach, discussed, *infra*.

At summary judgment, reference to the avenues of proof merely serves to inform a court's evaluation of the evidence. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir.

19

2019) (recognizing that a Title VII plaintiff may avoid summary judgment by proceeding under the burden – shifting framework established in *McDonnell Douglas Corp. . . .*"); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas . . . .*").

"To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original). In *Warch v. Ohio Casualty Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006), the Fourth Circuit explained the concept of direct evidence:

> Direct evidence must be "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc) (citation and internal quotation marks omitted). Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action.

In the absence of direct or indirect evidence of discrimination, the focus shifts to the plaintiff's second avenue of proof—the burden-shifting approach articulated by the Supreme Court in *McDonnell Douglas*. The *McDonnell Douglas* proof scheme "is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). But, courts have applied the *McDonnell Douglas* proof scheme to a variety of employment statutes. *See*, *e.g.*, *Young*, 575 U.S. at 212 (construing Pregnancy Discrimination Act); *Guessous*, 828 F.3d at 216 (discussing *McDonnell Douglas* framework); *Ennis v. National Ass'n of Business and Educational Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995) (the Americans with Disabilities Act).

There is no direct evidence of discrimination in this case.  Therefore, I turn to review the *McDonnell Douglas* proof scheme.  It is "a procedural device, designed only to establish an order of proof and production."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted).  Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination.  *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).  However, a plaintiff asserting discriminatory treatment "may avoid summary judgment by proceeding under the burden – shifting framework established in *McDonnel Douglas Corp. v. Green . . . .*"  *Haynes*, 922 F.3d at, 223 (Title VII).

If the plaintiff chooses to proceed under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination."  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against the employee "under circumstances which give rise to an inference of unlawful discrimination."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

To state a prima facie claim of discrimination, the plaintiff must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'"  *Goode v. Cent. Va. Legal Aid Soc*., Inc., 807 F.3d 619, 626 (4th Cir. 2015) (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012)); *see also Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019); *Rayyan v. Va. Dep't of Transp*., 719 F. App'x 198,

203 (4th Cir. 2018).

If the plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the

court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination."). Squire contends that he was subject to discriminatory discipline, a type of disparate treatment claim. *See* ECF 60-1 at 15.

As noted, these two approaches merely establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. On summary judgment, these approaches merely help to guide a court's evaluation of the evidence. *Cf. Pettis*, 592 F. App'x at 160 (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").

**B.**

Squire contends that he was subjected to discriminatory discipline, a type of disparate treatment claim. *See* ECF 60 at 17. According to Squire, the discipline he received for refusing an assignment was more severe than discipline handed down to other drivers, and he alleges that it was because Brown had learned he is transgender.

Disparate treatment occurs when an employer has treated an employee "'less favorably than others because of' a protected trait." *Ricci*, 557 U.S. at 577 (citation omitted). To establish a prima facie claim of discriminatory discipline, "the plaintiff must show: (1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those

other employees." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1997); *see Sook Yon v. Sebilias*, 481 F. App'x 848, 850 (4th Cir. 2012).

If the plaintiff "succeeds in proving a prima facie case, the burden of going forward shifts to the employer, who must articulate a non-discriminatory reason for the difference in disciplinary enforcement." *Cook*, 988 F.2d at 511. If the employer does so, the burden then shifts back to the plaintiff to "demonstrate that the employer's reasons are not true but instead serve as a pretext for discrimination." *Id.*

As indicated, "the existence of some adverse employment action is required" for a plaintiff to prevail on a Title VII discrimination claim. *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).[7] An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Freightliner, LLC*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Certainly, this element has been met.

In a disparate treatment case, the plaintiff must establish "'that the defendant had a discriminatory intent or motive' for taking a job related action." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (citation omitted); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000) ("The ultimate question in every disparate treatment case is whether the plaintiff was the victim of intentional discrimination."). "Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.'" *Raytheon Co.*,

---

[7] In the context of a retaliation case, the plaintiff need only establish an adverse action, and not an adverse *employment* action. *See Strothers v. City of Laurel*, 895 F.3d 317, 327 n.3 (4th Cir. 2018).

540 U.S. at 52.

Notably, where a plaintiff asserts a disparate treatment claim, the plaintiff must demonstrate that a comparator is similarly situated in all relevant respects. *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017). This includes "that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood v. Locke*, 387 F. Appx 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)); *see Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013), *aff'd*, 576 F. App'x 199 (4th Cir. 2014).

Of course, the comparison "'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances.'" *Haynes*, 922 F.3d at 223-24 (citation omitted); *see Irani v. Palmetto Health*, 767 F. App'x 399, 420 (4th Cir. 2019) (per curiam). Nevertheless, "[i]f a plaintiff wishes to prove that a defendant's legitimate, non-discriminatory explanation is pretext by pointing to other employees who were treated differently, '[t]he similarity between comparators . . . must be clearly established in order to be meaningful.'" *Swaso*, 698 F. App'x at 748 (quoting *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008)); *see Farrelly v. Acme Markets, Inc.*, Civil Action No. CCB-08-1992, 2011 WL 778583, at *7 (D. Md. Feb. 10, 2011). Thus, conclusory assertions are insufficient. *See Swaso*, 698 F. App'x at 748; *cf. Sanchez v. Whole Foods Mkt.*, No. 18-cv-3106-GJH, 2019 WL 3717771, at *4 (D. Md. Aug. 5, 2019); *Bowen v. Md. Dept. of Pub. Safety and Corr. Servs.*, No. 17-cv-1571-RDB, 2018 WL 1784463, at *10 (D. Md. Apr. 12, 2018).

The discriminatory discipline framework is well established in the Fourth Circuit. *See, e.g.*, *Delmarva Power & Light Co.*, 715 F. App'x at 303 (citing *Freightliner, LLC*, 650 F.3d at 336). Courts must consider both "discipline imposed for like offenses. . . and the reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances." *Cook*, 988 F.2d at 511. As the Supreme Court observed in *McDonnell Douglas*, 411 U.S. at 802 n. 13, "the facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *See Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985) (modifying the *McDonnell Douglas* prima facie framework for a discriminatory discipline case).

## C.

The threshold question here is whether plaintiff falls into a protected class under Title VII. The Supreme Court has not definitively resolved whether transgender individuals constitute a protected class under Title VII. The case of *Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) (en banc), *cert. granted* 139 S. Ct. 1599 (Mem) (U.S. Apr. 22, 2019), is pending in the Supreme Court. In that case, the Second Circuit determined that "Title VII prohibits discrimination on the basis of sexual orientation as discrimination 'because of . . . sex.'" *Zarda*, 883 F.3d at 108.

But, in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court determined that Title VII bars discrimination on the basis of sex stereotyping. *Id.* at 250. To my knowledge, the Fourth Circuit has not applied *Price Waterhouse* in a reported decision involving a Title VII claim brought by a transgender individual. But, several other circuits have concluded that discrimination based on transgender status is cognizable as a sex discrimination claim under Title

VII. *See, .e.g., EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571–72 (6th Cir. Mar. 7, 2018) (noting that transgender plaintiffs are not excluded from Title VII coverage because the discrimination would not have occurred but for the victim's sex); *Glenn v. Brumby*, 663 F.3d 1312, 1316–19 (11th Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes."); *Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000) (holding that a transgender plaintiff could state a claim under the Equal Credit Opportunity Act based on *Price Waterhouse*); *Schwenk v. Hartford*, 204 F.3d 1187, 1201–03 (9th Cir. 2000) (holding that a transgender plaintiff could state a claim under the Gender Motivated Violence Act based on *Price Waterhouse*); *see also Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004) (holding that "sex stereotyping based on a person's gender non-conforming behavior" is unlawful under Title VII); *G.G. Gloucester Cty. School Board*, 654 F. App'x. 606, 607 (4th Cir. 2016) (Davis, J., concurring) (noting that the First, Sixth, Ninth, and Eleventh Circuits "have all recognized that discrimination against a transgender individual based on that person's transgender status is discrimination because of sex under federal civil rights statutes. . . .").

And, several courts in this district have found that, under *Price Waterhouse*, "discrimination on the basis of transgender status constitutes gender stereotyping because 'by definition, transgender persons do not conform to gender stereotypes.'" *M.A.B. v. Board of Education of Talbot County*, 286 F. Supp. 3d 704, 714 (D. Md. 2018) (quoting *Finkle v. Howard Cty.*, 12 F. Supp. 3d 780, 787-88 (D. Md. 2014)). In *Finkle*, Judge Bredar said, *id.* at 788: "[O]n the basis of the Supreme Court's holding in *Price Waterhouse,* and after careful consideration of its sister courts' reasoned opinions, this Court finds that Plaintiff's claim that she was discriminated

against 'because of her obvious transgendered status' is a cognizable claim of sex discrimination under Title VII."

In any event, I need not decide the issue in the case *sub judice*. This is because FedEx does not contest plaintiff's membership in a protected class.

### D.

FedEx asserts: "There is no evidence in the record demonstrating that individuals involved in [Squire's] termination process knew that Squire is transgender." ECF 57-1 at 11. In this regard, defendant claims that "the only employees who had knowledge of the reason for [plaintiff's] surgery worked in the General Office in Harrison, Arkansas. These employees help to manage employee disability claims and they return the employees to service after the disability ends." *Id.* at 11–12.

According to FedEx, its employees lacked any knowledge of plaintiff's transgender status, which forecloses Squire from establishing a prima facie case under *McDonnell Douglas*. ECF 63 at 7. FedEx maintains that because "Squire cannot show that anyone involved in the decision to terminate him was aware that he is transgender, he fails to produce evidence of discrimination and summary judgment is appropriate." ECF 57-1 at 10–11.

Plaintiff counters that he provided Brown, who signed off on his termination, with paperwork "plainly demonstrating that the reason for his absence was a surgery, specifically a hysterectomy." ECF 60 at 13. Squire also furnished the employer with a letter from his gynecologist. *Id.* at 14.

Squire testified at his deposition that he gave Brown the form that indicated he underwent a hysterectomy as the reason for his medical leave. *See* ECF 60-1 at 5-8. He points to the exchange

with Martin, which shows that plaintiff did not want to provide the reason for his medical absence, but he was instructed by Martin that he had to do so. ECF 60-1 at 8; ECF 60-3.

As noted, Martin told Squire in the email/text exchange that he would "need a new DOT physical along with a release. The surgery will have to be listed on the new physical." ECF 60-3 at 2. Squire promptly raised privacy concerns (*id.* at 3), but Martin responded that he had to "provide the hard copies to [his] manager. . . ." *Id.* Squire testified that because of this instruction from Martin, he specified on the paperwork that he had a hysterectomy and submitted the paperwork to Brown. ECF 60-1 at 8.

Bartnik testified at his deposition that the DOT recertification forms go either to him or to the Center manager. ECF 60-5 at 10. It then goes into the employee's medical file, which is maintained in the manager's office. *Id.*

At her deposition, Martin testified that she was not aware that Brown would receive a copy of Squire's medical form. ECF 60-2 at 8. She also testified that it was not her belief that Brown would ever have received a copy of Squire's medical record. *Id.* But, she confirmed that management and the safety team would have received Squire's DOT physical. *Id.* at 9-10.

Further, the record contains an email from Munzer with Squire's name in the subject line. ECF 60-10 at 2. It references "Hysterectomy" in the body of the message. *Id.* The email was sent to Tammy Rogers and Debra Rhoades. *Id.* A handwritten note on the page establishes that someone at FedEx was aware that Squire did not want the fact of his hysterectomy disclosed. *Id.*

And, Squire submitted a letter from his doctor, dated October 10, 2016, documenting that he was under the care of a gynecologist. ECF 60-4; ECF 60 at 13-14. Plaintiff argues that the existence of this letter, combined with the paperwork he submitted to Brown identifying his

surgery as a hysterectomy, creates a genuine dispute of material fact as to whether Brown was aware that Squire was transgender. ECF 60 at 13-14.

Defendant concedes that the letterhead included a reference to obstetrics and gynecology. ECF 63 at 6. But, FedEx argues that the existence of a record indicating that Squire had a hysterectomy would not cause Brown to understand that Squire was transgender. ECF 63 at 4. Given that Brown was not deposed, the basis for this assertion is not evident.

Further, defendant notes that the letter does not state that Squire had a hysterectomy. *Id.* And, the letter refers to Squire as Mr. Squire. *Id.* at 5. Thus, defendant argues that any contention concerning Brown's subjective understanding of Squire's gender identity is speculative. *Id.* at 4-5. Defendant asserts, *id.* at 6:

> First, Mr. Brown would have to confirm that he paid attention to the small print reference to Obstetrics and Gynecology. Second, Mr. Brown would have to confirm that he believed that only a Gynecologist was treating plaintiff. Third, Kevin Brown would have to believe that Gynecologists do not treat men. Fourth, Kevin Brown would have to assume that the surgery was a hysterectomy rather than some other surgery that does not involve gender reassignment.

The letter is one page, and "Department of Obstetrics and Gynecology" is clearly visible on the top right side of the page. ECF 60-4. The letterhead also specifies, in small print, that the practice of the doctor is limited to "gynecologic oncology" and "pelvic reconstructive gynecologic surgery." *Id.* Further, the letter states that Squire was under the care of a gynecologist. *Id.* And, it was Brown who made the decision to terminate Squire.

In a footnote, defendant notes that the American Board of Obstetrics and Gynecology has "changed a decades old rule and now permits Gynecologists to treat male patients." ECF 63 at 6 n. 2. The footnote includes a link to an article dated January 31, 2014, titled "Gynecologists can

now treat men, board rules."[8]   Defendants seem to assume that Brown, a manager, was aware of the change in the medical specialty.  *See* ECF 63 at 6.   But, a factfinder could conclude that Brown realized that Squire was transgender once he learned that Squire, who identified as male, underwent surgery performed by a gynecologist.

In the light most favorable to Squire, the Court cannot conclude that Brown was unaware of Squire's transgender status when he returned from his surgery.   There is sufficient evidence in the record on which a reasonable jury could conclude that Squire noted on his DOT paperwork that he had a hysterectomy and that he gave the paperwork to Brown.   Thus, plaintiff's claims are not foreclosed on the basis of alleged lack of knowledge by Brown or others at Fed Ex.  *See* ECF 63 at 7.

### E.

FedEx argues that Squire's allegations of harassment and criticism should not be construed in and of themselves as giving rise to a claim of discrimination because Squire "failed to support this claim with valid evidence."   ECF 57-1 at 12.   FedEx elaborates in its Reply that Squire fails to establish a prima facie case because he has failed to establish "any evidence of animus against transgender people."   ECF 63 at 7.   Squire, according to defendant, "admitted that the specific employees he alleges harassed and discriminated against him never said anything to him about being transgender."   *Id.* And, "Squire admitted he had no evidence of anyone using any slur for people that are transgender."   *Id.* at 7-8.   However, showing direct proof of animus is not part of the prima facie case under *McDonnell Douglas.*

---

[8]       https://www.nydailynews.com/life-style/health/gynecologists-treat-men-u-s-board-rules-article-1.1597928

Squire does not squarely present an argument involving a comparator. However, he provided the deposition testimony of John Keenan, a driver who worked with Squire. ECF 60-8 at 5, p. 10. There is no evidence to suggest that Keenan is transgender. Both Keenan and Squire were supervised by Patterson. *Id.* And, Brown was the manager for both drivers. *Id.*, p. 11.

Keenan testified that he had refused assignments, but he had not been disciplined for doing so. *Id.*, at 6, p.14. Further, he testified that he knew of other drivers who had refused assignments, but he was not aware of anyone other than Squire who had been disciplined for doing so. *Id., p. 15*; *Id.*, p. 17. There is no evidence in the record showing that Keenan or any of the other drivers were transgender.

Martin, who worked in Human Resources, indicated that she was not aware of "any other city drivers. . . who were involuntarily separated for insubordination." ECF 60-2 at 14. In addition, Bartnik, FedEx's operations manager (ECF 60-9 at 2), could not recall an incident of insubordination that triggered a "disciplinary action of critical or higher." ECF 60-5 at 8. However, he recalled an incident in which a driver initially refused to make a delivery. *Id.* at 14. After Bartnik spoke to that driver, the driver was allowed to complete the delivery. *Id.*

FedEx points out that the unidentified employee referenced by Bartnik is not a suitable comparator, because after that employee refused the assignment, Bartnik "told the employee the consequences of refusing the assignment. . . ." ECF 63 at 8. The employee then "changed his mind and delivered the freight." *Id*; *see* ECF 60-5 at 14; ECF 63-5 at 3. Thus, according to FedEx, Bartnik's testimony on this point does not demonstrate discriminatory discipline. ECF 63 at 8. However, Squire testified that he was not given the opportunity to change his mind, so as to complete the delivery. ECF 60-1 at 16-17.

FedEx does not address Martin's testimony that she was not aware of any other employee who had been terminated for insubordination. *See* ECF 60-2 at 14. And, it does not address Keenan's testimony that he had refused assignments and was not disciplined, and was aware of other drivers who had refused assignments but who were not disciplined. *See* ECF 60-8 at 6, pp. 14-15.

Because FedEx does not contest Squire's membership in a protected class, and because Squire has produced evidence that he was disciplined more severely than Keenan for refusing to complete an extra delivery, Squire has established a prima facie case for discriminatory discipline under Title VII.

**F.**

Under *McDonnell Douglas*, the employer may rebut the prima facie case of discrimination by providing a legitimate, non-discriminatory reason for the employment action. If the defendant produces, "through the introduction of admissible evidence," legitimate, non-discriminatory reasons for its disputed employment action, "the presumption raised by the prima facie case is rebutted" and "drops from the case." *Burdine*, 450 U.S. at 255. Specifically, in discriminatory discipline cases, the defendant must articulate "a non-discriminatory reason or the difference in disciplinary enforcement." *Cook*, 988 F.2d at 511.

FedEx contends that it has produced evidence that shows that it "terminated plaintiff for refusal to accept an assignment." ECF 57-1 at 13. It posits that when Squire was offered the choice of two runs and declined both, he was insubordinate. *Id.*

Patterson asked Squire to choose the delivery he would make. ECF 57-10 at 3. Squire declined, initially telling Patterson that he was declining, because it was too late in the day. *Id.* at 2. By refusing to take either of the deliveries, FedEx argues that Squire "forced defendant into a

precarious position of either requiring another driver to perform both additional runs or fail to deliver the goods to the customer." ECF 57-1 at 14. FedEx also notes that the "Conduct of Employees Policy specifically defines insubordination as a refusal to accept a work assignment." *Id.*; see ECF 57-6 at 3 (defining "Insubordination" in part as the "[i]mproper refusal to perform assigned work").

In assessing the defendant's proffered reasons, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (alterations omitted) (quoting *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998) (citation and internal quotation marks omitted)). When the question at issue is whether the decisionmaker acted with discriminatory animus, only the "perception of the decision maker" is "relevant to the question." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 319 (4th Cir. 2006) (citations omitted). Thus, "the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Id*. at 315.

FedEx has articulated a legitimate, non-discriminatory reason for Squire's termination. However, FedEx's proffered reason is not quite on point. The elements of discriminatory discipline require the employer to provide "a non-discriminatory reason for the *difference in disciplinary enforcement*." *Cook*, 988 F.2d at 511 (emphasis added). FedEx does not address Keenan's claim that he was not disciplined at all for the same conduct.

Nevertheless, I shall assume, *arguendo*, that FedEx satisfied the employer's burden. Even so, Squire has demonstrated a genuine issue of material fact as to whether FedEx's reason was pretextual.

## G.

As noted, once the defendant has articulated a non-discriminatory reason for the employment action, the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. To show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or "'unworthy of credence,'" *Mereish v. Walker,* 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Burdine,* 450 U.S. at 256), and that discrimination or retaliation was the true reason for the adverse employment action. *Hicks*, 509 U.S. at 515 (plaintiff must prove "*both* that the reason was false, *and* that discrimination was the real reason"); *accord Adams v. Trustees of Univ. of North Carolina–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011).

The beliefs of an employee who does not make the employment decision at issue, or intentionally and proximately cause it, are generally not relevant to the issue of pretext. *See Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) (holding employer liable for act motivated by antimilitary bias where mid-level supervisor intentionally and proximately caused act, even though the top-level supervisor was the de facto decisionmaker); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (en banc) (holding employer responsible under Title VII and ADEA for actions of employee "principally responsible for the decision or the actual

decisionmaker"); *see also Vicino v. Maryland*, 982 F. Supp. 2d 601, 611 (D. Md. 2013) (synthesizing cases). However, evidence that many employees shared a common discriminatory animus may be evidence of a "corporate culture" likely to have influenced the decisionmaker. *See*, *e.g.*, *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) ("While the views of others are no proof of the views of Stoddard, at some point the corporate environment in which he worked places Stoddard's own selective use of [a particular physical test] in Merritt's case in a less neutral context.").

Squire essentially argues that FedEx's stated reason for firing him is pretextual because FedEx did not follow its own procedures in disciplining him, and disciplined him more severely than other employees who refused extra assignments. ECF 60 at 19-20. FedEx argues that Squire cannot establish that the reason was pretextual because he "fails to show whether employees with less seniority were still working at the time he refused the assignment. In fact, plaintiff fails to demonstrate that ANY other employee was working at the time." ECF 57-1 at 15.

As I see it, plaintiff has generated a genuine dispute of material fact regarding whether FedEx's statement that it fired him for insubordination was pretextual. First, the Driver Manual refers to "Showtime," the "time at which a driver must report to Dispatch." ECF 60-14 at 3. The incident with Squire occurred once his shift was underway, so it is not clear whether this procedure applies. Notably, the Driver Manual states: "Drivers refusing work offered them will be considered a voluntary quit and their name will be removed from the seniority list. . . ." *Id.* The separation specified on the Personnel Change Request indicated that the separation was "involuntary." ECF 60-12 at 2.

The Conduct Policy provides that "[i]mproper refusal to perform assigned work" is an example of "insubordination." ECF 60-15 at 3. But, there is a genuine dispute as to whether

Squire's refusal to accept the work was "improper." Squire claims that he told Patterson and Brown in the meeting that he declined the extra delivery because his hand was swollen. ECF 60-1 at 21; ECF 60-6 at 3. Squire's statement, although arguably self serving, provides evidence that he informed Brown and Patterson of the problem with his hand. Squire stated: "The reason I said I don't want neither is because I was told that we go by seniority which means there is someone somewhere below me who they could have gave this run to (and that I wasn't feeling well my hand was swollen)." ECF 60-6 at 3.

Bartnik testified that when a driver rejects an extra run, this "could be some insubordination." ECF 60-5 at 9. But, he also agreed at his deposition that if an employee refuses extra work, there might be an "exception" if that employee provides a reason. *Id.* at 14.

To be sure, the text messages between Squire and Patterson do not reflect that Squire initially told Patterson about his hand as the reason for declining the work. ECF 57-10. And, Squire's handwritten statement did not mention a problem with his hand. ECF 63-3; ECF 63-1 at 13. But, Squire claims he told his supervisor of his health problem when he returned to the office. The issue of whether Squire timely provided a valid reason for declining the work is a credibility determination for the factfinder.

It is also noteworthy that Bartnik did not testify that insubordination necessarily results in automatic termination. Instead, he discussed the levels of discipline that FedEx usually followed: typically disciplinary actions went through a process of coaching and written discipline in conjunction with HR. ECF 60-5 at 7. Yet, the Corrective Action Recap specifically notes that there had been no prior corrective action for Squire. ECF 60-13 at 4. And, Martin testified that she was unaware of any other City driver who had been terminated for insubordination. ECF 60-2 at 14. "When an employer relies on its internal procedures to justify a termination decision,

evidence that these procedures were violated may indicate pretext." *Blasic v. Chugach Support Servs., Inc.*, 673 F. Supp. 2d 389, 399 (D. Md. 2009) (citing *Plotke v. White*, 405 F.3d 1092, 1104 (10th Cir. 2006).

There is also a genuine dispute over whether the normal practice of assigning extra work at FedEx involved seniority. Bartnik characterized seniority-based assignments as "common courtesy." ECF 60-5 at 15. Contrary to FedEx's argument that Squire cannot show any other employees with less seniority were working at the relevant time on March 8, 2017, Keenan testified that he began driving for FedEx in September 2014, and that Squire was working for FedEx at Annapolis Junction "when [he] started working there." ECF 60-8 at 4 p.7; *id.* at 5 p. 10. Thus, Keenan would have been junior to Squire. And, he testified that he and another employee were working when Squire declined the extra run. *Id.* at 6 p.15-16. This suggests that Squire was not the least senior driver who was working on the date in question.

Although June disputed the use of seniority in the assignment of extra work, he did not do so completely. June testified that if there were no volunteers, extra runs were primarily assigned by shift start time. ECF 57-4 at 3 pp.10-11. But, he noted that within the same shift time, seniority would come into play with respect to the assignment of extra work. *Id.* p. 12. And, the overflow procedure in the Driver Manual at least contemplates some assignments based on seniority. *See* ECF 60-14 at 6.

And, Squire testified that disciplinary action against him increased after he returned to work following his hysterectomy. ECF 57-3 at 8. He characterized those write-ups as "false." *Id.*

### IV.     Conclusion

For the aforementioned reasons, I shall deny defendant's Motion.

An Order follows.

Date: March 12, 2020                                  _____/s/_____

Ellen L. Hollander
United States District Judge